

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00165-CR

_____

JUAN TREVINO, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 421st District Court
Caldwell County, Texas
Trial Court No. 14-027

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

Layla[1] was six years old at the time her father, Juan Trevino, Jr., was tried and convicted in Caldwell County[2] of three counts of aggravated sexual assault of a child and one count of indecency with a child by contact all involving Layla as the victim. The investigation leading to Trevino's charges began after Layla exhibited many behavioral problems in pre-kindergarten, when she was about four years old.

Layla had issues, and there was evidence that those issues persisted. Her teacher for the first part of her pre-kindergarten year described Layla as a "handful as far as discipline" and added that she would not listen or mind instructions and that she would be mean to and hurt other children. Then, Layla did not show empathy, but rather laughed and saw nothing wrong with having hurt the other child.

On appeal, Trevino complains of improper witness examination by the State and jury-charge error. We affirm the trial court's judgments and sentences because we find that (1) Trevino was not harmed by the State's improper questioning of a witness and (2) Trevino was not harmed by the inclusion in the jury charge of definitions of "female sexual organ" and "penetration."

Before we discuss the issues, further factual context is needed.

---

[1]We refer to the child complainant with a pseudonym. *See* TEX. R. APP. P. 9.10.

[2]Originally appealed to the Third Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We are unaware of any conflict between precedent of the Third Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

Layla's mother, Virginia, testified that, when Layla first started school, she behaved well. According to Virginia, Layla had minor attitude issues but nothing like the behavior issues described by witnesses.

The following year, Layla was placed in a different school, and Virginia said Layla's behavior "improved." However, Layla's kindergarten teacher, Vanessa Valdez—presumably her teacher at the new school, as this would follow the pre-kindergarten acts described by most of the witnesses—said Layla "had a lot of behavior problems," "had a hard time controlling her emotions," and "would retaliate by hitting other students [and] physically throwing objects that were nearby." Valdez added, "And she wasn't like this just to the other students. She was like this to teachers as well." Valdez also said Layla frequently had urinary accidents, sometimes many times a day. In Valdez' opinion, this was not common for a kindergarten student. This continued throughout Layla's kindergarten year (with a brief respite of about one month after the Christmas break). Valdez said she tried to contact Virginia "numerous times," but never received a response.

School nurse, Shanna Guenther, testified that, on December 19, 2013, Layla came to the nurse's office after having wet her clothes. As she had done many times before, Guenther helped Layla remove her soiled clothes and sent her to the restroom to put on clean clothes Layla had brought with her. By the time Layla emerged, though, she had already wet herself again. Guenther, concerned the child might have a urinary tract infection or be in pain, asked Layla, "[Layla], what's up?" and whether the child was feeling burning or pain. Layla said, "It hurt where [her] daddy had put things and touched her at night when he laid down with her." Guenther notified the assistant principal and Child Protective Services (CPS), as well as the police.

Later that day, Layla was taken to Sexual Assault Nurse Examiner (SANE) Noella Hill, who examined Layla. Hill testified that she was alone with Layla and that the little girl told her "a boy" had touched her, then said the boy was Trevino.[3] According to Hill, Layla said that

> [Trevino] had taken a bath or [Layla] was taking a bath at her house and that he placed a towel over her leg and then placed his fingers in her private[,] which she described as her private. . . . She said his "wee wee[,]" which would have been his penis[,] was placed in her private and her butt and then also in her mouth. And that she -- she tasted some medicine that came out of his wee wee.

Hill used a diagram[4] with Layla to identify body parts; Hill said Layla told her her father "had kissed her chichis[,] which her chichis were her breast area on the diagram[,] and that it hurt her." Layla also told Hill "her mom had hurt her chichis also," "her mom had put her finger in her bottom and that it hurt," and "her mom would hit her with a belt."[5] Hill also described a "notch" on Layla's hymen, which Hill interpreted as an indication of physical trauma. She explained that, if the hymen "gets broken or let's just say torn, it tries to heal itself back. And so as it heals back that's actually what it leaves is a little notch sometimes." This notch, testified Hill, was "consistent" with the allegations of abuse Layla had made to the nurse. On cross-examination, though, Trevino pointed out that the expert, whose article Hill relied on to reach that conclusion, had subsequently authored another article documenting cases in which non-abused prepubescent girls' hymens had similar notches. Hill acknowledged, on reviewing this later document, the

---

[3]On cross-examination, Hill described Layla's statements as "She said a boy touched me. And then further said he has black hair. My dad touched me. His name is Juan."

[4]The diagram includes a handwritten note, "(Patient circled the places on the body where she was touched)." The bottom, vagina, chest/breast, and face areas were circled on the diagram.

[5]There is no indication in the record whether these allegations were investigated or pursued.

4

expert author's opinion that hymen notches such as the one found on Layla were not determinative of sexual abuse or trauma. On re-direct examination, Hill said the newer article did not change her earlier opinion.

After this examination, CPS Investigator Cammi McCormick arranged for Layla, Layla's three siblings, and their mother to stay at a women's shelter that night. McCormick advised Trevino to have no contact with Layla and to find somewhere else to stay. To this point, McCormick said Virginia was cooperative with the unfolding investigation. The next day, forensic interviews were scheduled for Layla and her three siblings. In her interview, Layla said no one had looked at or touched her "butt" or her private area. When forensic interviewer Vanessa Paulini asked Layla whether anyone had told her what to say in the interview, Layla said, "[Y]es," but then asked Paulini if she was a doctor. Later, according to Paulini, Layla claimed that no one had told her what to say. Paulini said that, in her experience, children would deny or recant prior allegations of abuse if a parent had indicated they did not believe the child's accusation. We discuss below evidence suggesting that Virginia did not believe Layla's allegations, or may not have been supportive of prosecuting Trevino. Paulini also described Layla as "distant," as tending to avoid answering questions, and as covering her face at times. In Paulini's opinion, this was not normal for a child of Layla's age.

Melissa Rodriquez, who ran the women's shelter where the family stayed the night of the initial outcry, claimed to have significant experience as a forensic interviewer of child sexual assault victims. Rodriquez told the jury that, when a child of Layla's age demonstrates violent behavior toward others or regresses to incontinence after potty training, such conduct may be

5

symptomatic of sexual abuse. Nurse Practitioner Amanda Hodge worked at a urologist office to which Layla and her mother were referred after the outcries to Guenther and Hill. Hodge testified that incontinence in a child of Layla's age was not uncommon and that, based on the history provided, Layla had never been completely continent since potty training. Hodge also said that child sexual abuse has been reported to be a cause for enuresis and that Layla's urinalysis was normal. Dr. Rebecca Kim, Layla's pediatrician since 2012 (approximately a year before the allegations), testified that she had not seen Layla for specific urinary problems in the fall of 2013, shortly before Layla made the statement to Guenther that started the investigation. This seems to contradict testimony from Guenther and Luna that Layla's mother told them Layla had been seen specifically for the constant enuresis.

There was also much testimony that Layla had a problem with truth-telling. Interning for her school psychology degree, Jolene Ellis worked with Layla and testified that Layla lied from time to time, but that she also told Ellis when she was lying. One teacher reported that Layla claimed she or other teachers had physically harmed her, but these allegations were found to be "observably untrue." One pre-kindergarten teacher described a time when she was chasing Layla, who frequently "tr[ied] to escape, run down halls, [and] out the door," and Layla accused the teacher of choking her, despite the fact that the teacher's hands were nowhere near the child's neck. Another time, after the teacher rubbed Layla's back to induce her to sleep, but put her hands nowhere near Layla's throat, Layla accused the teacher of choking her. An aide to the teacher once reported Layla saying that the aide had hit Layla, when she had not. Ellis said it became her practice to only meet with or counsel Layla when others were around and doors were open. Layla

6

told forensic interviewer Paulini that she "likes to lie [and] that she lies to everybody because she wants to."

Trevino presented testimony from a forensic psychologist, Michael Gottlieb, who testified that children of four years "or less really are not able to distinguish fantasy from reality." Gottlieb had not met Layla or any of the other witnesses. He generally suggested that Layla's behavior may have stemmed from neglectful parenting by Virginia, pointing to testimony about Virginia's failure to diligently follow through with treatment directions for the enuresis. Gottlieb found it significant that Layla's acting out and behavior problems predated her allegations of sexual assault. He acknowledged that neither sexual abuse, nor "many other reasons," could be ruled out as precipitating factors in Layla's behavior.

Virginia testified, variously, that Trevino had never been alone with Layla, that Trevino was "usually" with Virginia, or "always" with Virginia. According to Virginia, Trevino had never even changed Layla's diapers. She claimed pediatrician Kim told her Layla's urination accidents were "just a phase" that would "go away." Virginia acknowledged having been notified by Layla's teachers that Layla had problems, like kicking others, being rebellious, and experiencing incontinence. According to Virginia, when Trevino was jailed, Layla was so upset that she did not want to go to school, and teachers or the principal would have to pull a screaming Layla away from Virginia. Virginia said she believed that Layla was afraid of the teachers and school nurse; that, a few months after Layla's outcries of abuse, Virginia had Layla moved to a different teacher's class; and that Layla had told her mother that the first teacher "was mean to her and that she wouldn't let her go to the restroom." Virginia testified that, when she asked Layla if "daddy

7

had done anything to her," Layla "said no." Virginia took Layla to visit Trevino in jail at least once.

Layla testified, but did not repeat any allegations. She said one pre-kindergarten teacher, Ms. Knapp, was mean to her, and the other, Ms. Luna, would not let her go to the restroom when she needed. Layla said she did not remember speaking to school nurse Guenther in December 2013, but that, shortly thereafter, she remembered going to a hospital but did not remember meeting SANE Hill. She did say she remembered someone at the hospital making sure she was ok, but denied, or did not remember, telling that person anything. She also remembered staying at the shelter that night. She remembered seeing Paulini, the forensic interviewer, but said she had not said anything to her and did not know why she had been to see Paulini. Layla admitted to telling lies, but claimed that she always told the other person that she was lying. The prosecutor tried to ask again about her statements to Guenther, asking Layla, "[I]f you told Mrs. Guenther something, would that have been right or would that have been wrong?" Layla answered, "That would be wrong." When asked if she told Guenther "something wrong," Layla shook her head side to side. When the State asked again if Layla remembered talking to a doctor or nurse at the hospital, Layla said, "Yes." But Layla did not want to talk about that conversation. At that point, Layla put her head down in her arms and, shortly before that, had apparently put her hand in front of her face. When asked why she did not want to recount her conversation at the hospital, she twice shrugged her shoulders and twice said, "I don't know." At any rate, the jurors were present and were able to evaluate whether they believed Layla's behavior on the stand indicated trauma

from testifying or from her prior experiences. *See Marshall v. State*, 479 S.W.3d 840, 845 (Tex. Crim. App. 2016); *Cain v. State*, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997).

*(1)      Trevino Was Not Harmed by the State's Improper Questioning of a Witness*

Trevino complains that the State was allowed to improperly question Virginia. The challenged questions all referenced earlier testimony from Layla's pre-kindergarten teacher, Stephanie Luna, contrasting Virginia's testimony with Luna's testimony. It is improper for a party to question a witness about the veracity of another witness' testimony. *See Ex parte McFarland*, 163 S.W.3d 743, 755 n.37 (Tex. Crim. App. 2005) ("[T]he rules of evidence prevent an attorney from impeaching one witness' testimony with the testimony of other witnesses."). Although the questions posed to Virginia were improper, we conclude that they, and her answers, were harmless.

To address these issues, we provide excerpts from the questions and answers at issue, with Trevino's complained-of questions highlighted in bold print. The State asked if Virginia would be surprised "if Ms. Luna testified that [Eric[6]] never had any of the problems that [Layla] had?" Virginia answered, "Well, [Eric] urinates in the bed at night. So Mrs. Luna is not there." The State then asked, "Oh okay. **So Ms. Luna's obviously not telling us the truth**?" The highlighted question is the subject of Trevino's first complaint.[7] Virginia did not answer, the court recessed proceedings for lunch, and the State did not pursue this line of questioning after lunch.

---

[6]A pseudonym for Layla's brother.

[7]Trevino's trial objection was that this question was argumentative; we will assume, for the sake of argument and the interest of justice, that this preserved error.

A little later, Virginia testified that she asked for Layla to be removed from class, because Layla told Virginia that Luna "was mean to her" and "wouldn't let her go to the restroom" and that Luna thought Layla was lying. The State asked, "So if Ms. Luna has testified that the reason that you requested for [Layla] to be moved was due to the fact that you were telling [Layla] that the reason her dad was incarcerated was because of Ms. Luna?" Virginia denied this, and the State asked, "**Who would be telling the truth** at that point?" After Trevino's objection was overruled, the State again asked, "**Who would be telling the truth** then?" Virginia answered, "Well, I know that I'm not lying about -- I don't have anything against anybody at the school. My problem is my daughter. If my daughter's being uncomfortable in the class, I feel that I'm her mother and I need to intervene." The State then said it did not believe she had answered its question and asked, "I said **who would be lying**?" Virginia replied, "Well, I don't know."[8]

Later, after explaining why she asked for Layla to be removed from Luna's classroom and describing Luna's statements that she did not believe Layla needed to go to, or was actually going to, the bathroom when she asked, the State asked, "And if Ms. Luna testifies to something different **would she be telling the truth in that testimony**?" At this point, after the trial court overruled Trevino's objection and denied his request for a running objection, the State again asked who would be "telling the truth in that circumstance," and Trevino did not object. Essentially, this last question was the same as the others to which Trevino did object.

---

[8]The objection here was "to the term lying," but again, we feel the subject of Trevino's complaint was apparent to the court from the context, and we will entertain the point of error.

The State does not suggest that these questions were proper, but, instead, urges us to find them harmless.[9] We find no harm in the highlighted questions to Virginia or in her answers in response. The State was contrasting Virginia's version of events with those presented by another witness. "[W]hen the appellant said that the officer was lying, he was merely saying that his version of the affair was correct and that of the officer incorrect. We see nothing in such answer which would tend to bring him into disrepute with the jury." *Creech v. State*, 329 S.W.2d 290, 291 (Tex. Crim. App. 1959). There had been evidence adduced that Virginia may have disbelieved Layla's accusations or failed to support the child in those accusations. Forensic interviewer Paulini testified that a subsequent recantation of allegations was "usually because there's a non-supportive parent."[10] The nurse practitioner at the urologist's office said Virginia did not follow the medical instructions such as ensuring regular bathroom trips and administering laxatives to Layla. CPS Investigator McCormick testified that, in the weeks after the initial outcry and investigation, Virginia became "defensive" regarding the allegations after having been "upset and cooperative" when the allegations were first made known to her. Detective Bell also said Virginia was initially cooperative when he spoke with her after the SANE examination and the forensic interview, but in the weeks following, "the interaction changed completely," and Virginia was "not . . . cooperative at all."

---

[9]"While the questions [to the defendant whether other witnesses were lying where their description of events was different from defendant's] may have been argumentative, we do not perceive reversible error in light of the entire record." *McKinney v. State*, 491 S.W.2d 404, 408 (Tex. Crim. App. 1973).

[10]Rodriguez testified similarly that a recantation may be a symptom of a non-supportive parent, but this was in voir dire, outside the jury's presence.

11

Virginia, although called as a State's witness, did not seem entirely convinced of the truth of Layla's accusations. As discussed in both *Creech* and *Ayala v. State*, 352 S.W.2d 955, 956 (Tex. Crim. App. 1962),[11] the differences in witnesses' perceptions or recollections of events are for the jury to weigh and resolve. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) ("The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses."). We find any error in the State's questions harmless beyond a reasonable doubt.[12]

*(2)     Trevino Was Not Harmed by the Inclusion in the Jury Charge of Definitions of "Female Sexual Organ" and "Penetration"*

Trevino also argues that the trial court reversibly erred by including, in the jury charge, definitions of "penetration" and "female sexual organ." "As a general matter, definitions for terms that are not statutorily defined are not considered to be the 'applicable law'[13] under [Texas Code of Criminal Procedure] Article 36.14, and it is thus generally impermissible for the trial court to define those terms in the jury instructions." *Green v. State*, 476 S.W.3d 440, 445 (Tex. Crim. App. 2015).[14] Including the definitions was error.

---

[11]Three officers testified that they stopped Ayala's vehicle and that Ayala was unsteady on his feet, was incoherent in his speech, and smelled strongly of intoxicants. Ayala and his wife testified he had not been drinking the day of the stop. Because "[t]here was a sharp conflict in the testimony with reference to the odor of alcohol on appellant's breath," "under the conflicting testimony, Ayala's testimony "could not . . . have injured him before the jury." *Ayala*, 352 S.W.2d at 956.

[12]Without expressly stating it, all the opinions we have found addressing this matter treat it as non-constitutional error, and that is how Trevino presents his argument. *See* TEX. R. APP. P. 44.2(b); *see also Streff v. State*, 890 S.W.2d 815, 820–21 (Tex. App.—Eastland 1994, pet. ref'd).

[13]The term "applicable law" references "the law applicable to the case" required by statute. *See* TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007).

[14]That said,

> an exception to that general rule exists for "terms which have a known and established legal meaning, or which have acquired a peculiar and appropriate meaning in the law, as where the words

Where we have found error in the trial court's jury charge, we next "evaluate whether sufficient harm resulted from the error to require reversal." *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) Where, as here, the defendant objected to the erroneous part of the charge, he must demonstrate only that he suffered some harm to obtain a reversal. *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986). While this harm must be "actual, rather than theoretical," "the presence of any harm, regardless of degree, which results from preserved charging error, is sufficient to require a reversal of the conviction." *Id.* It is the appellant's burden to "persuade the reviewing court that he suffered *some actual harm* as a consequence of the charging error. If he is unable to do so, the error will not result in a reversal of his conviction." *LaPoint v. State*, 750 S.W.2d 180, 191 (Tex. Crim. App. 1986) (op. on reh'g). The effect of the error must be considered "in light of the entire jury charge, the state of the evidence, including the contested issues and the weight of probative evidence, the arguments of counsel and any other relevant information revealed by the record of the trial as a whole." *Sanchez v. State*, 376 S.W.3d 767, 774–75 (Tex. Crim. App. 2012) (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)).

*Jury Charge.* Other than the improper definitions, the charge as a whole was a correct rendering of applicable law. The court's definition of penetration was very brief: "penetration of

---

used have a well-known common law meaning." *Kirsch* [*v. State*], 357 S.W.3d [645,] 650 (quoting *Medford* [*v. State*], 13 S.W.3d [769,] 772). Such terms are "considered as having been used in their technical sense," and, therefore, it is not error for the trial court to include in its instructions "a precise, uniform definition" to guide the jury's deliberations. *Medford*, 13 S.W.3d at 772.

*Green*, 476 S.W.3d at 445.

any degree."[15]  The definition of female sexual organ accurately described the subject.  The charge instructed that "female sexual organ" "means and includes the vulva or tissue surrounding the vagina and the vagina and the female genitalia or any parts between the labia of the female genitalia."[16]  As in *Green*, we find the court's definitions were "'mild [and] neutral,' describe[d] 'an obvious[,] common-sense proposition,' and thus . . . would not have impinged on the jury's fact-finding authority."  *Green*, 476 S.W.3d at 447 (quoting *Brown v. State*, 122 S.W.3d 794, 803 (Tex. Crim. App. 2003)).

Also as in *Green*, Trevino's defensive theory focused on attacking Layla's credibility.  In this case, and in *Green*, penetration of the female sexual organ was a central issue for the jury's consideration.  Neither of the definitions focused the jury's attention "on a particular type of evidence."  *See id.*

> The totality of the record shows that the jury's focus would have been on this element of the offense regardless of the inclusion of the definitions, which were accurate under the law and did not function to draw additional or undue attention to any particular evidence that might weigh in favor of or against a finding of guilt.

*Id.* at 447–48.

The charge, considered as a whole, weighs against a finding of harm.

---

[15]Contrast this with the definition of penetration given in *Green*:

> [P]enetration occurs so long as contact with the female sexual organ could reasonably be regarded by ordinary English speakers as more intrusive than contact with the outer vaginal lips and is complete, however slight, if any.  Touching beneath the fold of the external genitalia amounts to penetration within the meaning of the aggravated sexual assault statute.

*Id.* at 446–47.

[16]Green's proposed charge defined the female sexual organ as the entire female genitalia, including both vagina and the vulva. Vulva is defined as the external parts of the female sexual organs, including the labia majora, the labia minora, mons veneris, clitoris, perineum, and the vestibule or entrance to the vagina. *Id.* at 447.

*Closing Arguments.* The State made no reference to the definitions in its closing arguments. Rather, it stressed Layla's believability, how difficult it had been for the six-year-old to testify in open court about the alleged abuse, and the lack of support from her mother, who seemed not to believe the accusations, or at least preferred to ignore them. Trevino's closing argument likewise did not address the definitions, but attacked Layla's credibility and that of the SANE.

Our consideration of the closing arguments leads us to conclude that they weigh against a finding of harm.

*The Evidence.* The case was tried on whether Trevino sexually contacted Layla. There was no argument over the parts of the body involved or any line drawing regarding whether penetration occurred. As in *Green*, "the central dispute at trial was as to the complainant's credibility in asserting that appellant had sexually touched her at all, as opposed to a factual dispute as to the type or degree of touching alleged by the complainant." *Id.* at 451. Admittedly, Layla did not repeat the descriptions of abuse she made to Guenther and Hill. But those women did testify to statements Layla made to them, and that testimony was sufficient to support the jury's belief of the indictment's allegations. The State's case also pointed to several instances suggesting the child's mother did not support the allegations. Layla made her statements to Guenther and Hill on the same day. Virginia was with Layla that night in a shelter. The next day, Layla declined to make any accusations in a forensic interview, and it appears she never repeated the allegations. The jury saw all the witnesses, including Layla, in what was clearly a very uncomfortable situation

15

for the young girl. The jury made the credibility determinations regarding Guenther, Hill, Virginia, Layla, and the rest of the witnesses.

We find this factor weighs against a showing of harm. Trevino has not established that he suffered any harm as a result of the erroneous jury charge.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     February 10, 2016
Date Decided:       May 25, 2016

Do Not Publish